

LINDA LINGLE
GOVERNOR

MARK J. BENNETT
ATTORNEY GENERAL

LISA M. GINOZA
FIRST DEPUTY ATTORNEY GENERAL

**STATE OF HAWAII**
DEPARTMENT OF THE ATTORNEY GENERAL
425 QUEEN STREET
HONOLULU, HAWAII 96813-2913
(808) 586-1500

July 27, 2006

The Honorable Barry Kurren
U.S. District Court for the District of Hawaii
300 Ala Moana Blvd., Room C-338
Honolulu, HI 96813

    Re:    AlohaCare v. State, No. 00-1-3036-09

Dear Judge Kurren:

    We appreciate the opportunity to respond to the July 20th letter to the Court from AlohaCare in the above-captioned matter regarding the Request for Proposal (RFP) issued by the State on June 17, 2006, to procure health plan services for the QUEST program. QUEST is a program supported by state and federal funds under the authority of a waiver granted by the federal Centers for Medicare & Medicaid Services.

    The AlohaCare letter complains that the RFP contains terms that violate the Settlement Agreement entered into in this case and asks the Court by order to modify the terms of the RFP. It also asserts that the Department of Human Services (DHS) has not met ratesetting process requirements set out in the Agreement.

    There is no merit to these contentions. To the contrary, the letter represents the continuation of an extensive effort by AlohaCare and its owners to thwart the objectives of the DHS's procurement to obtain the benefits of more competition in the delivery of health care services under the QUEST program. The provision of the RFP of which AlohaCare complains (Section 72.400) is the DHS's response to these efforts by AlohaCare and its owners. Far from denying "equal treatment" to AlohaCare, the provision is intended to give every potential bidder an equal opportunity to qualify for a contract under QUEST -- the goal that AlohaCare and its owners are working so hard to prevent.

    The Department of Human Services is committed to carrying out a procurement in which all health plans desiring to participate are treated fairly and equitably. Section 72.400 and the attestations it requires from potential bidders is designed to carry out the longstanding federal policy that procurement transactions provide, to the maximum extent practical, open and free competition, and meets the DHS's obligation, as the recipient of federal funds, to be alert to organizational conflicts of interest as well as noncompetitive practices among contractors that may restrict or eliminate competition or otherwise restrain trade. *See* 42 C.F.R. § 434.6(a)(1) and

The Honorable Barry Kurren
July 27, 2006
Page 2 of 5

45 C.F.R. § 74.43. It also furthers the goal of providing choice among health plans for program recipients. *See* 42 C.F.R. § 438.52(a).

At the same time that DHS was working hard to attract more participating health plans, it was reported to DHS that some of AlohaCare's owner/members, who are federally qualified health centers ("FQHCs"), were taking the position that they would refuse to contract with any new health plans. This poses a serious concern to DHS because a large number of QUEST participants are familiar with and served by the FQHCs in their area, and CMS has made FQHC participation a presumptive requirement for health plans under the special terms and conditions of the QUEST waiver. A plan may only be excused from the requirement of having FQHCs in its network upon a showing that it has both an adequate capacity and appropriate range of services for vulnerable populations to serve the expected enrollment in all service areas. In many of the areas served by AlohaCare's owner FQHCs, there are few if any physicians or other health professionals who hold themselves out as available to serve the QUEST population.

An FQHC's refusal to contract with plans other than the ones in which it has an ownership interest appears to be precisely the type of "organizational conflict of interest" that threatens to undermine an open and fair procurement in which all bidders are treated equitably and reasonably. Because AlohaCare's owner FQHCs are essential provider of ambulatory health care on the islands, if one or several acting in concert strategically refuse to participate in health plans other than the one in which they have an ownership interest, there is a great risk that they will have effectively excluded new competitors from entering the marketplace.

In including Section 72.400 in the pending RFP, DHS took into account the special status of FQHCs under federal law. FQHCs are so designated pursuant to section 330 of the Public Health Services Act (42 U.S.C. §254b(k)). As such, an FQHC is obligated to "make every reasonable effort to establish and maintain collaborative relationships with other health care providers in the catchment area of the center" and to have a "contractual or other arrangement with the agency of the State" to provide services to persons eligible for Medicaid. 42 U.S.C. § 254b(k)(3)(B), (E).

Because of their special status, under federal Medicaid law, a Medicaid managed care plan is required to pay the FQHCs in its network the same level and amount of payment which it would pay to any other provider for comparable services. 42 U.S.C. § 1396b(m)(2)(A). DHS has repeated this requirement in the RFP and will ensure that the plans comply with it. Also as a matter of federal law, if a health plan's payment for services is less than the FQHC's prospective payment system rate (designed to capture its reasonable costs in providing the service), the DHS itself is obligated to pay a supplemental payment to the FQHC to make up the difference. 42 U.S.C. 1396a(bb)(5). In an April 1988 letter explaining these statutory provisions that was sent to all State Medicaid Directors, the Health Care Financing Administration (now

The Honorable Barry Kurren
July 27, 2006
Page 3 of 5

CMS) stated that the congressional purpose was "to encourage contracting" between FQHCs and health plans and "to remove financial barriers to this contracting." Accordingly, it took the position that a State may not impose additional requirements on health plans in contracting with FQHCs that "could result in access problems and have the opposite impact on MCO-FQHC/RHC contracting arrangements than what was intended by Congress." *Id.* DHS believes that its RFP is in furtherance of the congressional purpose by assuring that there are no barriers to health plans wishing to include FQHCs in their network.

DHS's concern that some of AlohaCare's owner FQHCs might, for the first time, refuse to participate in the health plans of other networks has been confirmed. As indicated in the attachments to plaintiff's letter to the Court, the Waianae Coast Comprehensive Health Center -- one of AlohaCare's FQHC owners -- has already informed a potential bidder that it will not participate in its QUEST network, ostensibly for reasons that are both financial ("incentive bonuses," etc.) and patient-related. The fact that AlohaCare's owner FQHC appears to be willing to participate in the health plan's "commercial product network" (in which AlohaCare is not a competitor) but not in the QUEST network (where it is) casts serious doubt on the genuineness of the reasons given and highlights the organizational conflict of interest that the RFP is intended to address.

In any case, given the special statutory provisions assuring FQHC's reasonable cost reimbursement for serving Medicaid patients (whether in managed care or fee-for-service settings) and the policy of inclusiveness on which that generous payment policy is based, an FQHC should not be free to condition participation in a health plan network on the receipt of bonuses or other additional remuneration, especially when this may preclude the entry of new competitors and limits the choices available to QUEST participants. As for the FQHC's suggestion that it may appropriately determine which plans "best meet the needs"of QUEST participants, that is a role for the DHS, *see* Haw. Rev. Stat. § 346-14, not individual providers. The RFP contains many detailed provisions and requirements that address the health plan operating systems (including the need to be HIPAA compliant) as well as their programs for considering the special health needs of the QUEST population.

For all of these reasons, DHS is confident that the RFP is consistent with the statement in the Agreement that "AlohaCare along with all other plans participating or interested in participating in the QUEST program are to be treated on an equal basis, pursuant to law."

AlohaCare's second claim that it has "seen nothing" that clearly indicates the implementation of the ratesetting process requirements outlined in the Settlement Agreement is also entirely unsupportable. The Agreement provides that AlohaCare and all other plans participating or interested in participating in the State's QUEST program will have the opportunity to provide any factors that they believe should be considered by the State's actuaries

The Honorable Barry Kurren
July 27, 2006
Page 4 of 5

in performing actuarial calculations and the actuaries shall determine its usefulness. The Agreement recognizes that "the plans' or parties' factors and supporting data may be accepted, rejected or otherwise considered by the State's actuaries at their professional discretion." The Agreement further provides that the captitation rates for the next QUEST RFP shall include "[r]ates or rate adjustments for enrollees with chronic illnesses and other costly health conditions" . . . "provided that it is not contrary to the actuary's findings and recommendations."

In this procurement the DHS is not setting capitation rates. Rather, it will determine a range within which bids must fall (not to be disclosed to bidders in advance). Nonetheless, to assist all bidders, including AlohaCare, the DHS has taken the following steps which more than fulfill its obligations under the Agreement:

- Plans, including AlohaCare, have provided their historical experience data for the purpose of rate development.

- DHS and their actuaries have worked closely with each plan to ensure proper interpretation and use of that data.

- The data book that will be used for rate development was provided to the health plans for their review.

- A conference call was held on July 14 to allow the health plans to ask questions and provide feedback regarding the data book and the rate submission process.

- Age/Gender rate factors were also provided prior to the July 14 meeting to allow time for questions or comments.

If any bidder offers rates below the actuarially sound range as determined by the DHS and their actuaries, there will be review and discussions of assumptions, data sources and modeling techniques to reach consensus regarding rate appropriateness.

As for any risk factor adjustment, data collected from the health plans was reviewed for adequacy regarding the application of a diagnosis based risk adjustment. The actuaries determined at this time that the data was inadequate to develop rate adjustments; however, the RFP allows for risk adjustment as early as July 2007. Prior to setting the July 2007 rates, plans will again be expected to contribute data and will again be allowed to offer input into the rate setting process.

As can be seen, there is clearly no warrant for interference in the pending RFP. Further, if AlohaCare is not in agreement with this assessment, we believe that it is a matter for a separate lawsuit. AlohaCare should not presume to occupy your time with this matter any

The Honorable Barry Kurren
July 27, 2006
Page 5 of 5

further. The case under which this matter is brought to your attention, has been dismissed and is officially closed.

      Because this exchange is taking place in the middle of the RFP process and in light of DHS's obligations to share information equally among all bidders, we are including AlohaCare's letter and this response in the material released to potential bidders to the RFP. We appreciate the Court's attention to this matter.

      Respectfully submitted,

Diane K. Taira
Deputy Attorney General

c: Edward Kemper, Esq. via fax 523-1406